IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

RICHARD L. GUINN,

                Petitioner,

    v.

JEFF PREMO, Superintendent,
Oregon State Penitentiary,

           Respondent.

Case No. 3:10-cv-00094-AC

FINDINGS AND RECOMMENDATION

ALISON M. CLARK
Assistant Federal Public Defender
101 SW Main Street
Suite 1700
Portland, OR 97204

      Attorney for Petitioner

JOHN R. KROGER
Attorney General
KRISTEN E. BOYD
Assistant Attorney General
1162 Court Street NE

1 - FINDINGS AND RECOMMENDATION -

Salem, OR  97301

Attorneys for Respondent

ACOSTA, Magistrate Judge.

Petitioner, an inmate at the Oregon State Penitentiary, brings this habeas corpus action pursuant to 28 U.S.C. § 2254.  For the reasons that follow, the First Amended Petition for Writ of Habeas Corpus should be DENIED.

## BACKGROUND

On April 1, 2003, a Jackson County grand jury indicted Petitioner on charges of Attempted Aggravated Murder, Conspiracy to Commit Aggravated Murder, and Solicitation to Commit Murder.  The charges arose from Petitioner's actions in March 2003 when he hired another person, Cody Johnson, to murder the mother of Petitioner's child.  In October 2003, the case was tried to a jury.

Petitioner and the mother had a long-standing dispute regarding the custody of their child. Petitioner and the mother had a surrogate pregnancy arrangement.  After the child was born, however, the mother asserted parental and custodial rights.  The mother was eventually granted legal custody of the child, and Petitioner was granted regular visitation with the child.  Petitioner was extremely unhappy with the custody arrangements.

Johnson, who was 17 at the time, was casually acquainted with Petitioner's brother and had met Petitioner one time.  On March 19, 2003, Petitioner approached Johnson at Johnson's house about some woodwork Petitioner needed done.  As the Petitioner and Johnson talked about the potential job, the conversation turned to Petitioner's child custody situation.  Johnson testified that

Petitioner "out of the blue" started talking about his child custody dispute and asked Johnson what he would do in that situation. Johnson responded that he would try to fight it in court. Johnson testified that Petitioner told him that "he was going to take the easy way out, which was murder her."

Petitioner then asked Johnson if he knew anyone who would kill the victim for him. Johnson testified that he agreed to do it because he was concerned for his own safety and he was concerned Petitioner would find someone else to carry out the killing if Johnson did not agree.

Petitioner told Johnson he would pay $35,000 for the killing; he would give Johnson the first $1,000 after his tax refund arrived, and he would pay the remaining amount over a period of time. Petitioner told Johnson he wanted the killing to be done with a gun. Johnson was to provide the gun and Petitioner would provide the ammunition. Before the meeting ended, Petitioner and Johnson exchanged phone numbers.

The following evening, Petitioner again went to Johnson's house. Petitioner drove Johnson to Wal-Mart to allow Johnson to see the victim, so he would be able to identify her when it came time to carry out the killing. Petitioner described the victim and explained he was meeting her to exchange their daughter for visitation. Johnson walked around the store while Petitioner met with the victim and picked up his daughter. As Johnson left the store, he glanced over at Petitioner and the victim. Petitioner, Johnson, and Petitioner's daughter then went out to Petitioner's car. Petitioner drove by the victim's residence to show Johnson where she lived.

Petitioner and Johnson met again the following day. Petitioner drove Johnson by the victim's apartment again. Petitioner wrote down the victim's license plate number and model of

her car and her apartment number, and also gave Johnson a map showing where the victim would park her car.

At this point Johnson told several people about Petitioner's plans. On March 24, Petitioner's father told the Medford police, who tried to contact Johnson but could not. On March 25, Johnson told his probation officer about Petitioner's plan. The probation officer called in a different Medford police officer. Johnson met with police on March 25 and gave them three notes he had from Petitioner and showed police where the victim lived.

The detectives asked Johnson to make a "pretext" telephone call to Petitioner. Johnson made two such calls, which were recorded. Johnson agreed to meet Petitioner again. Petitioner picked Johnson up at Johnson's home. Johnson was wearing a "body wire" which recorded their conversation. Petitioner and Johnson drove around for a while and discussed how the killing was to occur. Petitioner told Johnson he wanted him to shoot the victim in the back of the head the next night after Petitioner picked up their daughter and the victim was at home by herself. Petitioner also told Johnson to buy some drugs to leave behind at the victim's house to make the killing look like a drug deal gone bad.

On March 27, Petitioner asked his neighbor to let him use a few .22 bullets so he could test a gun he was considering buying. The neighbor gave Petitioner eight or nine .22 shells.

Later that day, Petitioner and Johnson spoke by telephone again. Petitioner told Johnson he wanted to meet so he could give Johnson the ammunition, which Petitioner said he had "oiled" so there were no fingerprints. Johnson asked Petitioner about the money, and Petitioner told

Johnson he expected the tax refund to arrive shortly. Petitioner and Johnson agreed to meet at a Fred Meyer store.

Before going to the store, Petitioner was again equipped with a body wire. At the parking lot, Johnson got into Petitioner's car. Petitioner checked Johnson for a listening device, but did not find the body wire. Petitioner gave Johnson nine .22 millimeter bullets wrapped in a paper towel. Petitioner did not give Johnson any money, but again promised to pay him when his tax refund check arrived. Petitioner told Johnson he was going to pick up his daughter like usual and go back to his house, and that he wanted Johnson to kill the victim sometime thereafter. Johnson asked Petitioner if he was still serious about killing the victim; Petitioner responded that "he wasn't backing out." After the meeting, Johnson went home. Nobody called him at home, and Petitioner never contacted him.

In the meantime, police had contacted the victim, interviewed her, and moved her to a safe house. Petitioner and the victim had planned to transfer the child at Wal-Mart at 6:00 p.m., but the victim, at police request, left Petitioner a message asking to move the meeting time to 7:00 p.m. Petitioner left a message with the victim agreeing with that plan.

At 7:03, Petitioner let a message with the victim saying ". . . where are you? I'm at Wal-Mart, why aren't you here? We need to make peace." The victim had no further contact with Petitioner.

At about 7:30 p.m., Petitioner went to his neighbor, Brian German. German testified Petitioner was very upset. Petitioner insisted that German take a key to Petitioner's home and asked German to take care of Petitioner's dog. Petitioner borrowed German's cordless phone and

walked away and made a call. He returned and told German he had just turned himself in to C. W. Smith, a police officer, because he had hired somebody to "get rid of the mother."

Petitioner had called 911 and asked the dispatcher to page C.W. Smith, a police officer with whom Petitioner was acquainted. Smith called Petitioner. Petitioner told Smith he needed advice because he had talked to a friend about "doing a hit on this woman." Smith advised Petitioner to contact his attorney and try to get the dispute about the child worked out. Smith testified that although Petitioner was distraught, he did not convey a sense of urgency and did not ask for help to stop something already underway.

At about 8:00 p.m., police officers went to Petitioner's home. They saw him riding up to the house on a bicycle and arrested him.

At trial, Petitioner raised a defense of renunciation, *i.e.*, that Petitioner abandoned the plan. Petitioner testified in his own defense. He acknowledged that Johnson's testimony was "pretty much" accurate. He testified that he did not think Johnson would go through with the plan, although he acknowledged when he gave Johnson the bullets that his intent was for Johnson to carry through. He added that he ultimately realized he was out of his mind and called Officer Smith to turn himself in. Petitioner also testified that he called Wal-Mart and had the victim paged, in an attempt to stop her from going home. Petitioner's niece testified that she was working at Wal-Mart on the night in question and recalled hearing two "emergency" pages for the victim.

The jury convicted Petitioner on all three counts. The trial judge merged the convictions and sentenced Petitioner to 120 months of incarceration.

Petitioner filed a direct appeal, but the Oregon Court of Appeals affirmed his conviction and sentence without opinion. *State v. Guinn*, 199 Or. App. 628, 113 P.3d 190 (2005). Petitioner did not seek review by the Oregon Supreme Court.

Petitioner then filed a petition for state post-conviction relief ("PCR"). Following an evidentiary hearing, the PCR trial judge denied relief. On appeal, the Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court denied review. *Guinn v. Blacketter*, 228 Or. App. 367, 208 P.3d 1057, *rev. denied*, 346 Or. 363, 213 P.3d 577 (2009).

On February 1, 2010, Petitioner filed his habeas corpus action in this Court. In his First Amended Petition for Writ of Habeas Corpus he alleges one claim for relief: ineffective assistance of trial counsel as guaranteed under the Sixth Amendment because counsel failed to investigate, prepare, and present an entrapment defense. Petitioner particularly faults counsel's failure to have Petitioner psychologically evaluated in support of an entrapment defense. Respondent concedes Petitioner exhausted his state remedies, but argues the state PCR decision denying relief on this claim was not contrary to or an unreasonable application of clearly established federal law.

## LEGAL STANDARDS

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act (AEDPA) of 1996. A litigant seeking a writ of habeas corpus from the district court must first exhaust the remedies available to him through the state courts. 28 U.S.C. § 2254(b)(1).

When a petitioner has exhausted his federal claims, however, this Court may grant a writ of habeas corpus only if the state court proceeding:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the United State Supreme Court; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d). Section 2254(d) is designed to confirm that state courts are the principal forum for asserting constitutional challenges to state convictions. *Harrington v. Richter*, 131 S.Ct. 770, 787 (2011). Section 2254(d)(1) applies to challenges to purely legal questions resolved by the state court, while § 2254(d)(2) applies to purely factual questions. *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004), *cert. denied*, 546 U.S. 963 (2005).

Section 2254(d)(1), set out above, consists of two alternative tests: the "contrary to" test and the "unreasonable application" test. *Cordova v. Baca*, 346 F.3d 924, 929 (9th Cir. 2003). Under the first test, the state court's "decision is contrary to clearly established federal law if it fails to apply the correct controlling authority, or if it applies controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result." *Clark v. Murphy*, 331 F.3d 1062, 1067 (9th Cir. 2003) (citing *Williams v. Taylor*, 529 U.S. 362, 413–414 (2000)), *cert. denied*, 540 U.S. 968 (2003),

Under the second test, "'[a] state court's decision involves an unreasonable application of federal law if the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case.'" *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003) (quoting *Clark*, 331 F.3d at 1067), *cert. denied*, 541 U.S. 1037 (2004). Under the "'unreasonable application' clause . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied

clearly established federal law erroneously or incorrectly." *Clark*, 331 F.3d at 1068 (quoting *Lockyer v. Andrade*, 538 U.S. 63, 74–75 (2003)). Instead, the application must be objectively unreasonable. *Id*. When evaluating whether the state decision amounts to an unreasonable application of federal law, "[f]ederal courts owe substantial deference to state court interpretations of federal law." *Cordova*, 346 F.3d at 929.

Under § 2254(d)(2), which involves purely factual questions resolved by the state court, "the question on review is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the finding is supported by the record." *Lambert*, 393 F.3d at 978; *see also Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004) ("a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable"), *cert. denied*, 534 U.S. 1038 (2004).

In examining the record under § 2254(d)(2), the federal court must be particularly deferential to the state courts. "[M]ere doubt as to the adequacy of the state court's findings of fact is insufficient; 'we must be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate.'" *Lambert*, 393 F.3d at 972 (quoting *Taylor*, 366 F.3d at 1000). In conducting its review, the Court "look[s] to the last-reasoned state-court decision." *Van Lynn*, 347 F.3d at 738.

The standards set out in § 2254(d) may appear difficult to meet because, in fact, they are. *Harrington*, 131 S. Ct. 770, 786 (2011). Section 2254(d) "stops short of imposing a complete bar

on federal court relitigation of claims already rejected in state proceedings." *Id.* The standard preserves authority to issue a writ of habeas corpus when there is "no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." *Id.*

The Sixth Amendment has been interpreted to guarantee a criminal defendant the right to effective assistance of counsel at all critical stages of a criminal proceeding that implicates substantial rights of the accused. *Menenfield v. Borg*, 881 F.2d 696, 698 (9th Cir.1989). If the Sixth Amendment right to counsel is violated, the defendant may use the violation to argue for federal habeas corpus relief under § 2254(d)(1).

Ineffective assistance claims are judged by the standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland* requires the defendant to prove that 1) counsel's performance was deficient—that the attorney made errors so serious that he was not actually functioning as the "counsel" the Sixth Amendment guarantees; and 2) deficient performance prejudiced the defendant-that counsel's errors were so serious as to deprive defendant of a fair trial with a reliable result. 466 U.S. at 687. In addition, the defendant must overcome a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *Id.* at 689. In granting such deference to counsel, the court must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

## DISCUSSION

Petitioner argues counsel provided constitutionally ineffective assistance because he relied upon the defense of renunciation, and failed to investigate, prepare, and present an entrapment

defense. The state PCR trial judge rejected this claim. At the conclusion of the evidentiary hearing, the judge stated:

> I think it is a strategy decision based on the testimony to use renunciation [sic] was a sound decision, and I don't find that any of the other things that you saw should have been done. There's just no evidence that shows that there would have been anything favorable had your attorney done any of those things and that they would have, in any way, affected the outcome.

Resp. Exh. 115, p. 7. The trial judge also made written findings consistent with this statement:

> Attorney made a strategy decision to use the defense of renunciation, not entrapment. Based on the trial testimony, the decision was sound.

Resp. Exh. 116. This decision was not contrary to or an unreasonable application of *Strickland*.

Under a defense of "entrapment," a person is not guilty of committing a crime if he was "induced" into committing the act. In Oregon, the defense is described in Or. Rev. Stat. § 161.275, which provides:

> (1) The commission of acts which would otherwise constitute an offense is not criminal if the actor engaged in the proscribed conduct because the actor was induced to do so by a law enforcement official, or by a person acting in cooperation with a law enforcement official, for the purpose of obtaining evidence to be used against the actor in a criminal prosecution.
>
> (2) As used in this section, "induced" means that the actor did not contemplate and would not otherwise have engaged in the proscribed conduct. Merely affording the actor an opportunity to commit an offense does not constitute entrapment.

Here, Petitioner approached Johnson and asked if he knew anyone who would kill the victim for him. After Johnson volunteered, and before police became involved in the case, Petitioner told Johnson he would pay him $35,000 for the killing. He specified how and where he wanted the killing done. He said he would provide the ammunition, which he did. He provided Johnson with the victim's license plate number, apartment number, and a map. The record does

not contain any evidence that Petitioner was pressured into the scheme by police or by Johnson acting on behalf of the police.

Petitioner's claim that counsel should have had Petitioner psychologically evaluated to support an entrapment defense is also without merit. Petitioner failed to provide the PCR court with any evidence of a psychological exam or any evidence as to what a psychological evaluation at the time of the criminal trial would have contained.

Petitioner's trial attorney was not inadequate or ineffective for failing to raise an entrapment defense. Based upon the record before the Court, there is no evidence to support such a defense. As such, Petitioner cannot establish a reasonable probability that, but for counsel's failure to investigate, prepare, and present an entrapment defense, the result of the criminal proceeding would have been different. The PCR court's decision denying relief was not contrary to or an unreasonable application of clearly established law and, as such, is entitled to deference.

## RECOMMENDATION

For these reasons, the First Amended Petition for Writ of Habeas Corpus should be DENIED, and judgment of DISMISSAL should be entered.

A certificate of appealability should be DENIED as Petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2).

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due July 28, 2011. If no objections are filed, review of the Findings and Recommendation will go under advisement that date.

A party may respond to another party's objections within 14 days after the objections are filed. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or on the latest date for filing a response.

DATED this 13th day of July, 2011.

John V. Acosta
United States Magistrate Judge

F:\Share\Acosta\10-94guinn0714f&r.wpd